IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA ex.
rel. BENJAMIN DECKER,

Qui Tam Plaintiff-Relator,

v.

UNDER SEAL DEFENDANTS 1 - XX,

Defendants.

_____/

Civil Action No. 23-10209

Hon.  Friedman

Mag.  Ivy

FILED *IN CAMERA* AND
UNDER SEAL

FALSE CLAIMS ACT

JURY TRIAL DEMANDED

## QUI TAM COMPLAINT FOR VIOLATIONS OF
## THE FEDERAL FALSE CLAIMS ACT

*Qui Tam* relator Benjamin Decker, through his attorneys Akeel & Valentine,

PLC and on behalf of the United States of America, files this Complaint against the

Detroit Club Management Corporation, Detroit Holdings, LLC, Emre Uralli, and

Lynn Kassotis (A.K.A. Lynn Uralli and Lynn Kassotis-Uralli), and alleges as

follows:

TABLE OF CONTENTS

I.     INTRODUCTION AND OVERVIEW ....................................................1

II.    PARTIES ...................................................................................2

    A.   Relator ................................................................................2

    B.   Defendants ...........................................................................3

III.   JURISDICTION AND VENUE ..........................................................4

IV.    APPLICABLE LAW ......................................................................5

    A.   The False Claims Act .............................................................5

    B.   The Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") ..........................................................................6

    C.   The Paycheck Protection Program ("PPP") .................................8

V.     ALLEGATIONS ..........................................................................14

    A.   Factual Backgrounds .............................................................14

    B.   Scheme To Defraud ..............................................................15

VI.    CAUSES OF ACTION ..................................................................19

## I.    INTRODUCTION AND OVERVIEW

1.      Relator, Benjamin Decker, brings this case on behalf of the United States Government against the Detroit Club Management Corporation, Detroit Club Holdings, LLC, Emre Uralli, and Lynn Kassotis (A.K.A. Lynn Uralli and Lynn Kassotis-Uralli) (collectively "Defendants"), for treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, and civil penalties under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), partially codified at 12 U.S.C. § 1833a, owed to the United States from at least two false and/or fraudulent claims submitted by the Individual Defendants in connection with the Paycheck Protection Program ("PPP").

2.      Specifically, Defendants made false and/or fraudulent statements to obtain at least two federally guaranteed PPP loans ("Subject Loans") totaling at least $758,946, which caused the United States to pay processing fees to the third-party lenders on each loan. The Defendants also made false and/or fraudulent statements in applications they submitted to have those federally guaranteed PPP loans forgiven, which caused the United States to pay *at least* $334,708 to reimburse the third-party lenders for the forgiven loans.

3.      Despite laying off nearly all employees, Defendants applied for and received two PPP loans claiming to have 53 full-time active employees. Contrary to

Defendants' certifications, the loans were not used on payroll or other qualified expenses. Defendants were not entitled to receive the loans and were not entitled to loan forgiveness. Nevertheless, Defendants directed Relator to fill out and file the loan applications and forgiveness applications.

## II.   PARTIES

### A.   Relator

4.     Relator, Benjamin Decker ("Relator" or "Mr. Decker") is a citizen of the United States of America and a resident of the State of Michigan, county of Wayne, and has material, non-public information regarding the false and fraudulent submissions alleged herein. He is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B).

5.     Relator is suing on his own behalf, and on behalf of, and in the name of, the United States of America, pursuant to 31 U.S.C. § 3730(b).

6.     In January 2018, Mr. Decker started working at the Detroit Club as a bartender. When the Detroit Club closed due to covid lockdown measures, Mr. Decker was laid off along with nearly all of the other Detroit Club employees. Mr. Decker was then brought back on to work at Detroit Club from December 2020 to December 2021. During this time, Mr. Decker worked for Defendants in several roles including, bookkeeper, receptionist, office and hiring manager, executive assistant, and personal assistant to Mr. Uralli and Ms. Kassotis.

7.    Relator has complied with the notice provision of the FCA, 31 U.S.C. § 3730(b)(2), by providing to the Attorney General of the United States and the United States Attorney for the Eastern District of Michigan, prior to the filing of this Complaint, with a statement of material evidence and information related to this complaint, which supports the existence of the false claims by Defendants. (**Ex. A**)

## B.    Defendants

8.    The Detroit Club Management Corporation, d/b/a The Detroit Club, ("Detroit Club") is a Michigan corporation with its headquarters in Detroit, Michigan. The Detroit Club is a social club and hotel located at 712 Cass Ave, Detroit, MI 48226.

9.    Detroit Club Holdings, LLC ("Detroit Holdings") is a Florida Corporation with a principal place of business and registered agent mailing address in Michigan. Detroit holding owns the building at 712 Cass Ave, Detroit, MI 48226 that Detroit Club operates out of. On November 3, 2015, Detroit Holding filed an application for certificate of authority to transact business in Michigan with the Michigan Department of Licensing and Regulatory Affairs.

10.   Lynn Kassotis (A.K.A. Lynn Uralli and Lynn Kassotis-Uralli; hereinafter "Lynn Kassotis" or "Ms. Kassotis") is a citizen of the United States of America and a resident of Michigan. Ms. Kassotis is the owner, president, and

director of the Detroit Club. Ms. Kassotis is the managing member of Detroit Holdings

11.     Emre Uralli ("Mr. Uralli") is a citizen of the United States of America and a resident of Michigan. Mr. Uralli is the owner, operator, and manager of the Detroit Club. Mr. Uralli is a member of and the registered agent for Detroit Holdings.

## III.     <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found and transact business in the Eastern District of Michigan.

14.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this district. At all times relevant to this Complaint, Defendants conducted business within this district.

## IV.    APPLICABLE LAW

### A.    The False Claims Act

15.    The FCA was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, needed modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

16.    The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains[.]

31 U.S.C. § 3729(a)(1).

17.     For purposes of the FCA, a person acts "knowingly" if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA does not require proof that a defendant specifically intended to commit fraud. 31 U.S.C. § 3729(b)(1)(B).

18.     Under the implied false certification theory, however, FCA liability can arise where "the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016). This follows the rule that "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Id.* at 2000.

**B.     The Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA")**

19.     Congress enacted FIRREA in 1989 to strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors, as well as certain government agencies and various other covered entities. Pub. L. 101-73, 103 Stat. 183 (1989).

20.     Section 951 of FIRREA, as amended, codified at 12 U.S.C. § 1833a, provides that the Attorney General may recover civil penalties of up to $1 million per violation against persons who commit specified violations as established by a preponderance of the evidence. *See* 28 C.F.R. § 85.5 (the maximum civil penalty was increased to $2,073,133 for assessments after December 13, 2021 for which violations occurred after November 2, 2015). The statute further provides that the Attorney General alternatively may recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or the loss. Id. The predicate violations identified in Section 951 that can form the basis for liability under FIRREA include, among others: (a) knowingly or willfully making a materially false or fraudulent statement affecting a federally insured financial institution (18 U.S.C. § 1001); (b) making a false statement on a loan application to a financial institution, "the accounts of which are insured by the Federal Deposit Insurance Corporation" (18 U.S.C. § 1014); and (c) knowingly making a false statement for the purpose of influencing a decision by the Administrator of the SBA or to obtain a loan, money, or anything of value under the SBA's 7(a) program, including the PPP (15 U.S.C. § 645(a)).

21.     Section 1109(i) of the CARES Act provides that PPP loans are SBA loans for purposes of 15 U.S.C. § 645.

C.     **The Paycheck Protection Program ("PPP")**

22.     The SBA is a cabinet-level agency of the United States headquartered in Washington, D.C. The SBA's mission is to preserve free, competitive enterprise and to maintain and strengthen the overall economy of our nation by assisting in and facilitating the creation and growth of small businesses, a critical component of the country's economic strength and health.

23.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic. CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

24.     The CARES Act authorized forgivable loans to small businesses and self-employed individuals for payroll, mortgage interest, rent/lease, utilities, and certain other business-related expenses through the PPP. CARES Act § 1102(b)(1), 134 Stat. at 293.

25.     The PPP was implemented under section 7(a) of the Small Business Act, 15 U.S.C. § 636, and is administered by the SBA. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811 (April 15, 2020).

26.     To obtain a PPP loan, a qualifying business would submitted a PPP loan application, which was signed by an authorized representative of the business. The

PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

27.    During the period that PPP loans were available to the public, the PPP loan amount available to qualifying small businesses was determined by the business's average monthly payroll costs or gross income. 15 U.S.C. § 636(a)(36)(E). PPP loans were capped at 2.5 months' payroll up to $100,000 per employee on an annualized basis. *Id*. and § 636(a)(36)(A)(viii)(II)(aa). In other words, the max amount a business would qualify for is $20,833 per full-time employee.[1]

28.    A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan

---

[1] $100,000 divided by 12, multiplied by 2.5, equals $20,833.

using its own monies. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. 15 U.S.C. § 636(a)(36)(B). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan and subsequent forgiveness process.

29.     PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

30.     For rental costs to be eligible, a valid lease must have been entered prior to February 15, 2020. Further, if rent is paid to a related entity, then eligible expenses are limited to the amount of mortgage interest owed on the property during the covered period. *See* 85 FR 52881, subsection III.2.b. (Aug. 27, 2020)

31.     The application process to obtain a PPP loan required the eligible recipient to make the following good faith certifications and acknowledgments:

      a.  That the applicant was eligible to receive a PPP loan under the rules in effect at the time the application was submitted (the "PPP Rules");

b. That the uncertainty of current economic conditions made the loan request necessary to support the ongoing operations of the eligible recipient;

c. That the applicant was in operation on February 15, 2020, had not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees, or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC;

d. That the funds would be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, or other covered costs under the PPP Rules;

e. That if the funds were knowingly used for unauthorized purposes, the federal government may find the individual legally liable for such charges as fraud;

f. That not more than 40 percent of the loan proceeds may be used for nonpayroll costs;

g. That documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs,

covered mortgage interest payments, covered rent payments, and covered utilities would be provided to the lender if required;

h. That the eligible recipient had not received and would not receive another loan under the Paycheck Protection Program;

i. That the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects;

j. That the applicant understood that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. §§ 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000.00; under 15 U.S.C. § 645 by imprisonment of not more than two years and/or a fine of not more than $5,000.00; and, if submitted to a federally insured institution, under 18 U.S.C. § 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.00; and

k. That the lender would confirm the eligible loan amount using the documents submitted by the applicant.

32.    PPP loans were issued in multiple rounds. Loans made during the period beginning on March 27, 2020, and ending on the day before December 27,

2020 are considered "First Draw" loans. Loans made after December 27, 2020 are "Second Draw" loans.

33.     The SBA paid lenders a processing fee for each PPP loan. For loans of not more than $350,000, lenders were paid a processing fee of five percent the loan amount. For loans between $350,000 and $2,000,000, lenders were paid a processing fee of three percent the loan amount. 15 U.S.C. § 636(a)(36)(P)(i).

34.     The PPP provides that up to the full amount of a PPP loan can be forgiven if the PPP funds were spent on eligible purposes over an 8-week to 24-week covered period after the PPP loan is issued. *Id*. § 636m. To obtain forgiveness, the borrower must submit a PPP Loan Forgiveness Application Form 3508S ("SBA Form 3508S"), which requires the borrower to certify compliance with all requirements of the PPP.

35.     SBA Form 3508S requires the borrower to submit supporting documentation to establish that the full amount of the forgiveness request was used on applicable expenses. After the PPP loan is forgiven, the SBA reimburses the lender for the full amount of the PPP loan plus interest on the loan.

36.     However, even without seeking forgiveness, PPP loans are subsidized through the government by offering very favorable terms. PPP loans have a one percent interest rate, with all payments deferred for at least six months. Loans issued prior to June 5, 2020 have a two year maturity, while loans issues after June 5, 2020

have a five year maturity. No collateral or personal guarantees were needed to receive the loans.

## V.   ALLEGATIONS

### A.   Factual Backgrounds

37.    Defendants Mr. Uralli and Ms. Kassotis jointly own and operate Detroit Holdings and Detroit Club. As its name implies, Detroit Holdings is a holding company for Mr. Uralli's and Ms. Kassotis' real estate development and business operations. For purposes of this case, Detroit Holdings is primarily used as the vehicle that owns the real property which Detroit Club operates out of.

38.    On or around December 2013, Mr. Uralli and Ms. Kassotis, through Detroit Holdings, bought The Detroit Club, a historic social club in downtown Detroit, including the building that houses the club—located at 712 Cass Ave., Detroit MI, 48226.

39.    On February 11, 2014, Mr. Uralli and Ms. Kassotis filed articles of incorporation, forming the Detroit Club Management Corporation, which operates the various aspects of the Detroit Club.

40.    Presently, the Detroit Club has various business and social aspects, including a membership-based social club, a hotel, a restaurant, a cocktail bar, a cigar longue, and an on-site spa.

41.     Mr. Decker began working for Detroit Club on or around January 2018. His initial position was as a bartender.

42.     When Covid-19 lockdown measures took full effect in or around March 2020, Detroit Club laid off nearly all of its employees, including Mr. Decker. However, in or around November 2020, Mr. Uralli and Ms. Kassotis reached out to Mr. Decker with a job offer. At that time, the prior bookkeeper for the Detroit Club was going on maternity leave and Defendants needed a replacement. Mr. Decker accepted this offer and worked for Detroit Club again from December 2020 to December 2021. During this time, Mr. Decker and filled various roles at Detroit Club, including front desk reception, bookkeeper, office and hiring manager, executive assistant, and personal assistant to Mr. Uralli and Ms. Kassotis. In these roles, Mr. Decker gained first-hand, direct knowledge of fraudulent and false claims made by Defendants Detroit Club, Mr. Uralli, and Ms. Kassotis.

43.     From December 2020 to December 2021, Mr. Decker managed payroll activities for Detroit Club, completed a daily accounting, was responsible for handling the company's financials, was directly involved in preparing the PPP loan and forgiveness applications, and regularly communicated with the PPP loan lender.

**B.     Scheme To Defraud**

44.     Despite laying off nearly all of its employees, Detroit Club applied for and received two PPP loans by claiming to have 53 active, full-time employees. This

is a material misrepresentation that rendered Detroit Club ineligible to receive PPP loans in the amounts that it applied for.

45.    Detroit Club's first PPP loan is SBA loan # 9656627007 and was approved on April 9, 2020 for $348,400.00. The approving lender was Loan Source Incorporated ("Loan Source"). Even though it had laid off nearly all of its employees, Detroit Club reported that it actively had 53 full-time employees and used this fraudulently inflated monthly payroll expenses to calculate its eligible loan amount.

46.    The application for this first loan was prepared and submitted by Detroit Club's previous bookkeeper. prepared and submitted the first draw loan. After this previous bookkeeper went on maternity leave and Mr. Decker was brought on to fill that role (amongst other responsibilities), Mr. Decker had to regularly communicate with the Loan Source to get approval for the first PPP loan and subsequent forgiveness application. Pursuant to this, Mr. Decker gained first-hand direct knowledge of the first PPP loan application by reviewing the application and supporting documentation. Mr. Decker also spoke with the prior bookkeeper several times throughout this review process.

47.    Based on Mr. Decker's first-hand and direct knowledge, Detroit Club did not have anywhere near 53 active employees at the time that the Detroit Club applied for the first PPP loan nor during the covered period after Detroit Club

received disbursement of the loan. Despite certifying that that the loan funds would be used and were used on payroll expenses for these 53 employees, Detroit Club had approximately two to five employees during the covered period.

48. Detroit Club then applied for, and received, PPP loan forgiveness. On May 13, 2021, Detroit Club received $334,707.87 in loan forgiveness based on the false statement that it had spent that much on payroll during the covered period following disbursement of its first PPP loan. Based on his first-hand and direct knowledge as the bookkeeper and officer manager for Detroit Club, Mr. Decker knows that Detroit Club's actual payroll expenses during the covered period were significantly lower.

49. Detroit Club's second PPP loan is SBA loan # 5043498403 and was approved on February 7, 2021 for $410,546.00. This second loan was also approved by Loan Source. Even though it had laid off nearly all of its employees, Detroit Club reported that it actively had 53 full-time employees and used this fraudulently inflated monthly payroll expenses to calculate its eligible loan amount.

50. Mr. Decker was directed by Mr. Uralli and Ms. Kassotis to use these false numbers to fill out the application for the second PPP loan on behalf of Detroit Club. Based on Mr. Decker's first-hand and direct knowledge, Detroit Club did not have anywhere near 53 active employees at the time that the Detroit Club applied for the second PPP loan nor during the covered period after Detroit Club received

disbursement of the loan. Despite certifying that that the loan funds would be used and were used on payroll expenses for these 53 employees, Detroit Club had approximately two to five employees during the covered period.

51.     Additionally, in preparing the second PPP loan application, Mr. Decker was directed by Mr. Uralli to report that Detroit Club would have thousands of dollars in eligible rent expenses during the covered period. However, Detroit Club did not have any such rent expenses and in fact had no rental lease at all. Mr. Uralli directed Mr. Decker to pull out a Detroit Club check and deliver it to Mr. Uralli in case he needed to use it later to support the claim of rent expenses. Further, Mr. Uralli's and Ms. Kassotis' other business, Detroit Holdings, owned the building that Detroit Club operated out of. Therefore, even if there was a valid lease agreement (*i.e.*, entered before February 15, 2020), any eligible rent expenses would be capped at the amount of mortgage interest paid by Detroit Holdings during the covered period.

52.     Because of these materially false statements, Detroit Club was not entitled to receive either of the PPP loans nor the loan forgiveness. Each Defendant played an integral role in perpetrating this fraud. Each of these false claims were submitted knowingly.

## VI.    CAUSES OF ACTION

### COUNT I

### Violation of the False Claims Act 31 U.S.C. 3729(a)(1)(A)

53.    Relator incorporates by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

54.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729. *et seq.* ("Act")*,* as amended.

55.    Defendants knowingly and intentionally submitted, or caused to be presented, claims for payment where said claims contained materially false statements and misrepresentation.

56.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States for payment or approval.

57.    Specifically, Detroit Club—through Mr. Uralli, Ms. Kassotis, and Detroit Holdings—knowingly submitted false or fraudulent applications for federally guaranteed PPP loans that it was not entitled to and subsequently submitted a false or fraudulent application for PPP loan forgiveness of the first PPP loan.

58.    Defendants submitted two PPP loan applications through Loan Source—SBA loan numbers 9656627007 and 5043498403—and a materially false SBA Form 3508 in seeking forgiveness for the first PPP loan.

59.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, guaranteed the two loans, subsidized the loans terms, paid the processing/approval fees to the private, non-party lenders, and paid the full forgiveness amount. By reason of the Defendants' acts, the United States has been damaged, in a substantial amount to be determined at trial.

60.     As such, Defendants submitted false claims and violated the False Claims Act of the United States and are liable for all damages, penalties, fines set forth in those acts, as well as all other applicable relief.

## COUNT II

False Statements Material to False Claims
31 U.S.C. § 3729(a)(1)(B) against all Defendants

61.     Relator incorporates by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

62.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729– 3733, as amended.

63.     Defendants knowingly caused to be made or used at least three false records or statements material to a false or fraudulent claim, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B). Defendants signed or caused to be signed the PPP loan agreements for both PPP Loans—SBA loan numbers 9656627007 and 5043498403. However, each of these applications contained materially false statements because

Defendants dramatically inflated the number of employees it had on payroll at the time of application and during the covered period. As a result of these false statements, both PPP applications were approved, and the SBA disbursed at least $29,736.38 in processing fees to Loan Source.

64.     Also, while seeking forgiveness of the first loan (Loan No. 9656627007), Defendants knowingly and falsely stated in SBA Form 3508 that they had complied with all requirements in the PPP Rules. In reliance on Defendants' false statements, the SBA approved Detroit Club's forgiveness application and transmitted a total of $334,707.87 to Loan Source that processed the loan.

65.     Because of Defendants' acts, the United States suffered damages of at least $364,444.25, and therefore is entitled to treble damages under the FCA, as well as civil penalties for each of the false claims submitted to the SBA.

## COUNT III

False Statements to the SBA
Under 12 U.S.C. § 1833a (FIRREA) against all Defendants

66.     Relator incorporates by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

67.     This is a claim for civil penalties under FIRREA, 12 U.S.C. § 1833a, as amended.

68.     Defendants, for the purposes of fraudulently obtaining two federally guaranteed PPP loans and inducing the SBA to forgive one of the PPP loans, in

violation of 12 U.S.C. § 1833a, unlawfully, willfully and knowingly made false statements or certifications to SBA Lenders and the SBA in violation of 15 U.S.C. § 645(a).

69.     Specifically, Defendants signed, or caused to be signed, the PPP loan agreement for both loans, thereby knowingly falsely representing that they would "comply with all SBA guidance" by inflating the number of employees in calculating allowable expenses. Also, while seeking forgiveness of the First PPP Loan, Defendants knowingly and falsely stated in the SBA Forms 3508 that they had complied with all requirements in the PPP Rules. These false statements were knowingly false and made for the purpose of influencing the SBA to obtain PPP loan proceeds in violation of 15 U.S.C. § 645(a).

70.     Because of Defendants' acts, they are liable for civil penalties up to the maximum amount authorized under 12 U.S.C. § 1833a(b).

## PRAYER FOR RELIEF

**WHEREFORE** for the reasons discussed, Relator request this Honorable Court enter judgment in his favor, and in favor of the United States of America, against Defendants for compensatory and non-compensatory damages, in addition to treble damages, fines for each false claim submitted, and other damages as provided for under the FCA and FIRREA, plus costs, interest, and attorney fees as

provided for under the FCA and FIRREA, in addition to the other relief this Court deems just and equitable.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands trial by jury as to all issues triable.

Respectfully submitted,

Dated: January 26, 2023      By: /s/ *Samuel R. Simkins*

Shereef H. Akeel (MI Bar No. 54345)
Adam S. Akeel (MI Bar No. 81328)
Samuel R. Simkins (MI Bar No. 81210)
Daniel W. Cermak (MI Bar No. 84460)
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Road 420,
Troy, Michigan 48084
shereef@akeelvalentine.com (pro hac vice)
adam@akeelvalentine.com (pro hac vice)
sam@akeelvalentine.com (pro hac vice)
daniel@akeelvalentine.com (pro hac vice)